# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
GARY DUEY DULA,                          )
                                                    )
Plaintiff pro se,                              )
                                                    )
v.                                                 )          Civil Action No. 08-0196 (RBW)
                                                    )
U.S. DEPARTMENT OF JUSTICE, et al.   )
                                                    )
Defendants.                                   )
_____)

## DEFENDANT'S MOTION TO TRANSFER VENUE
## AND FOR ENLARGEMENT OF TIME TO RESPOND TO THE COMPLAINT

Defendants, by and through undersigned counsel, move to transfer this case to the

District of Maryland pursuant to 28 U.S.C. § 1404(a).  Further, Defendants request that the

deadline for filing a response to the complaint be deferred pending resolution of this motion to

transfer, making their response due no sooner than 15 days after the Court issues an order

resolving the transfer motion.[1]  In accordance with Local Civil Rule 7(m), counsel for

Defendants contacted the Plaintiff to request Plaintiff's position on this motion.  Plaintiff

opposes transfer and Defendants' request for an enlargement.

In support of this motion, Defendants refer the Court to the accompanying memorandum

of points and authorities.  A proposed Order consistent with this motion also is attached.


Dated: April 18, 2008                        Respectfully Submitted,


                                                    ___/s/_____
                                                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                                                    United States Attorney

_____

[1] If the Court grants the transfer motion, no answer and/or response will be due in this Court, and
the District of Maryland will determine the deadline for submitting an answer.

_/s/_
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_/s/_
BRANDON L. LOWY
Special Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530
(202) 307-0364


Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|                                         |   |                               |
|-----------------------------------------|---|-------------------------------|
| GARY DUEY DULA,                         | ) |                               |
|                                         | ) |                               |
| Plaintiff pro se,                       | ) |                               |
|                                         | ) |                               |
| v.                                      | ) | Civil Action No. 08-0196 (RBW) |
|                                         | ) |                               |
| U.S. DEPARTMENT OF JUSTICE, et al.      | ) |                               |
|                                         | ) |                               |
| Defendants.                             | ) |                               |

_____

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE**
**AND FOR ENLARGEMENT OF TIME TO RESPOND TO THE COMPLAINT**

**INTRODUCTION**

In this case Plaintiff seeks an immediate injunction against the National Security Agency

("NSA"), Central Intelligence Agency ("CIA"), and any other U.S. government agencies and any

other parties acting on their behalf, as well as a Writ of Peremptory Mandamus and a demand for

Specific Performance against the U.S. Department of Justice ("DOJ").[1]  Plaintiff argues that

there are ongoing violations of his Fourth Amendment Rights and other illegal actions

perpetrated against him and his family by persons associated with Defendants NSA and CIA, as

well as others believed to be acting on their behalf, including employees of two of Plaintiff's

previous employers.[2]  Although Plaintiff initiated this action in this Court, venue is more

appropriate in the District of Maryland.  The only nexus between this District and this case is the

fact that the Department of Justice is headquartered in the District of Columbia.  However, it is

apparent that the lion's share of the events giving rise to this complaint — namely, the Fourth

Amendment violations alleged by Plaintiff in his Complaint — have allegedly transpired or are

---

[1] Undersigned counsel notified the Court in its Notice of Appearance that he does not represent "any other U.S. government agencies and any other parties acting on their behalf," as they have yet to be identified.
[2] Plaintiff's previous employers are not parties in this case.

3

transpiring in the District of Maryland.  Additionally, Plaintiff resides in Maryland and the

National Security Agency resides there as well.  Accordingly, the District of Maryland is a more

appropriate forum for this case, and the interests of justice support transfer.

## **ARGUMENT**

**I.    THIS COURT SHOULD TRANSFER VENUE TO THE DISTRICT  OF MARYLAND.**

**A.    This Case Has an Inadequate Nexus to Washington, D.C.**

This case is governed by the general venue statute, 28 U.S.C. § 1391, which establishes

default rules for venue that apply to federal lawsuits where the underlying statutes do not specify

their own venue rules.  See 28 U.S.C. § 1391(a), (b), and (e) (each applying "except as otherwise

provided by law.").  Section 1391 identifies three possible bases for venue for claims against

federal government officials or agencies: (1) where a defendant resides; (2) the district where a

substantial part of the events or omissions giving rise to the claim occurred; and (3) the district

where the plaintiff resides if no real property is involved in the action.  See id. § 1391(e).

Plaintiff fails to allege specifically that venue is proper in this Court, but appears to rely on the

first prong of this test because he listed defendants DOJ and CIA as being located in

Washington, D.C.  See Compl. p. 5.  The locations of the CIA (incorrectly stated as Washington,

D.C.) and DOJ do not provide a basis for venue in this Court.

When a plaintiff bases his venue arguments solely on federal defendants' presence in

Washington D.C., the venue challenge should be examined "very closely."  Cameron v.

Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).  That close scrutiny has led courts in this

District to transfer cases to a district with a closer nexus to the parties' dispute.  See id. (ruling

Washington, D.C. was not the proper venue because the sole connection to Washington, D.C.

4

was the inclusion of the Director of the Federal Bureau of Prisons and the Attorney General in their official capacities); see also, e.g., Rosales v. United States, 477 F. Supp. 2d 213, 215-17 (D.D.C. 2007) (transferring case against federal agency to district in which the challenged events took place); Southern Utah Wilderness Alliance v. Norton, 315 F. Supp. 2d 82, 86-89 (D.D.C. 2005) (concluding environmental case should be transferred to Utah where D.C. officials only set general policies and did not make specific decisions being appealed); Joyner v. District of Columbia, 267 F. Supp. 2d 15, 20-21 (D.D.C. 2003) (holding that the case's only connection to Washington, D.C. was the situs of named federal government defendants and transferring to a district with which the case had several connections). "Courts in this [C]ircuit must examine challenges to personal jurisdiction and venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia." Thomas v. Department of Defense, 2006 WL 1890009 (D.D.C. 2006) (Walton, J.) (citing Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C.Cir.1993).

As was true in Cameron and Joyner, the acts and omissions at issue in this case allegedly occurred outside the District of Columbia. In this instant case, Plaintiff resides and works in the State and District of Maryland. See Complaint caption. He alleges that, inter alia, Defendants NSA and CIA have violated his Fourth Amendment Rights by taking actions including "illegal entry into residences, illegal searches and seizures of property from residences, illegal wiretaps and call redirection, intercept/alteration of U.S. mail and/or removal of mail from the system[,]" which presumably took place in the District of Maryland because the Plaintiff resides and works there. Complaint ¶ 7. Plaintiff also claims that he has made job-related visits to the headquarters

of the NSA and CIA, which are located in the Districts of Maryland[3] and Virginia,[4] respectively. Plaintiff does however demand specific performance on behalf of DOJ, which is headquartered in Washington, DC.  Nevertheless, most of the action sought by Plaintiff, including "provid[ing] immediate protection to the Plaintiff and his family…, [restoring] and insur[ing] the Fourth Amendment Rights of the Plaintiff and his family", as well as interfering in Plaintiff's state level litigation would likely all take place in the District of Maryland.  See Complaint ¶ 9.[5] Accordingly, the fact that one of the three defendants has offices in Washington, D.C. does not establish a sufficient connection to this District.

   **B.    The Factors Courts Consider When Determining Whether to Transfer A Case Pursuant to 28 U.S.C. Section 1404 Support Transfer to the District of Maryland.**

   For the "convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  A threshold question is whether the case could have been brought in the district to which transfer is sought.  See Stewart Organization v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v. Barrack, 376 U.S. 612, 613 (1964)).  Courts must conduct a case-by-case analysis and balance the private interests of the parties with public interests such as efficiency and fairness to decide if transfer is proper.  See id. at 29.  The moving party bears the burden to establish that it is proper to transfer the case.  See Trout Unlimited v. United States Dep't of Agriculture, 944 F. Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots Ass'n v. Eastern

---

[3] See Reinbold v. Evers, 187 F.3d 348, 353 (4th Cir. 1999) (indicating that NSA is headquartered at Fort Meade, Maryland); see also Exhibit 1 (driving directions to the National Cryptologic Museum, in which its proximity to the NSA is depicted).

[4] See Harbury v. Hayden, 444 F.Supp.2d 19, 31 (D.D.C. 2006) (indicating that CIA headquarters are in Langley, Virginia); see also Exhibit 2, Answer #11 (Frequently Asked Questions of the CIA, including its headquarters location).

[5] Although Plaintiff's allegations appear implausible, Defendants are not addressing the merits or the feasibility of the action sought by Plaintiff.  Defendants would address these claims as necessary pending the resolution of this motion.

Air Lines, 672 F. Supp. 525, 526 (D.D.C. 1987)) (citations omitted). Mr. Dula could have brought this case in the District of Maryland, and both the private and public interests favor transfer to that court.

        **1.**      **Plaintiff Could Have Brought This Case in the District of Maryland Because His Claim Arose in That Jurisdiction and He Resides There.**

Plaintiff clearly could have brought this case in the District of Maryland. As noted supra, venue is proper in the district where: (1) the defendant resides; (2) a substantial part of the events or omissions giving rise to the claim occurred; or (3) the plaintiff resides if no real property is involved in the action. See 28 U.S.C. § 1391(e). Plaintiff resides in the District of Maryland; and the principal defendants, the NSA and CIA, are located in the Districts of Maryland and Virginia, respectively. See n. 3, 4 supra. Further, a substantial part of the events or omissions giving rise to Plaintiff's claim allegedly occurred in the District of Maryland, because Plaintiff claims Fourth Amendment violations stemming from "illegal entry into residences" and other actions described above, and Plaintiff resides in the District of Maryland. See Complaint ¶ 7. In addition, most if not all of the relief sought by Plaintiff of DOJ, including the provision of "immediate protection to the Plaintiff and his family", the restoration and insurance of "the Fourth Amendment Rights of the Plaintiff and his family", as well as interference in Plaintiff's state level litigation would all take place in the District of Maryland. See Complaint ¶ 9. Finally, Plaintiff has another case pending the District of Maryland against the NSA and other private sector defendants, in which Plaintiff makes very similar allegations, such as that Defendants conducted, inter alia, "illegal searches, seizures, and thefts from Plaintiff's residence." Dula v. NSA, et al., 8:08-cv-00427-DKC (D. Md.).

**2.      The Private Interests Favor Transfer to the District of Maryland.**

Private interests also favor transfer.  When assessing private interests, courts consider: plaintiff's choice of forum, defendant's choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to sources of proof. See Trout Unlimited v. United States Dep't of Agriculture, 944 F. Supp. 13, 16 (D.D.C. 1996) (citation omitted).  Although courts generally accord substantial deference to a plaintiff's choice of forum, that deference is lessened when the forum chosen is not the plaintiff's home forum. See Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)).  Courts also apply less deference when the chosen forum has an inadequate nexus to the events in the case.  See Southern Utah Wilderness Alliance, 315 F. Supp. 2d at 86; Shawnee Tribe, 298 F. Supp. 2d at 24 (plaintiff's choice given less deference when the action has no "meaningful ties" to the jurisdiction).

**a.      Plaintiff's Choice of Forum Deserves Little Deference.**

Plaintiff's choice of forum deserves little deference because he does not reside in this District, and because this District "lacks meaningful ties to the controversy."  Southern Utah Wilderness Alliance, 315 F. Supp. 2d at 86.  Plaintiff alleges that Defendants NSA and CIA violated his Fourth Amendment rights by allegedly committing acts that would have taken place in the District of Maryland because the Plaintiff resides and works there.  See Complaint ¶ 7. Furthermore, most of the relief that Plaintiff seeks, including "provid[ing] immediate protection to the Plaintiff and his family…, [restoring] and insur[ing] the Fourth Amendment Rights of the Plaintiff and his family", as well as interfering in Plaintiff's state level litigation would all take

place in the District of Maryland.  See Complaint ¶ 9. [6]  DOJ has offices in Washington, D.C.

and Plaintiff alleges that he sent letters to DOJ, but that standing alone does not establish a

sufficient connection to this District.  See Complaint ¶ 8.

Accordingly, this case is similar to other cases in which courts have found that the private

interests favor transfer, wherein collectively the facts demonstrate that another district (in the

instant case, Maryland) has more meaningful ties to the litigation than does the District of

Columbia, and the plaintiffs' choice of forum is entitled to less deference.  See Montgomery v.

STG Int'l, Inc., 532 F. Supp. 2d 29, 33 (D.D.C. 2008) (citing Barham v. UBS Fin. Servs., 496 F.

Supp. 2d 174, 179 (D.D.C. 2007); Airport Working Group of Orange County, Inc. v. Dep't of

Def., 226 F. Supp. 2d 227, 231 (D.D.C. 2002) (finding that when the connection between the

controversy, plaintiff, and the forum are attenuated and lack a meaningful factual nexus, less

deference is given).

b.  Defendants' Choice of Forum Would Place This Case in a District
With Strong Connections to Dula's Case.

The Court next considers Defendants' choice of forum.  Defendants have legitimate

reasons for seeking transfer.  The District of Maryland is where Mr. Dula resides.  The District of

Maryland has the strongest connection to the case because it is home to one of the principal

defendants, which allegedly violated Plaintiff's Fourth Amendment rights, and is the jurisdiction

in which it is apparent that most of the alleged wrongdoing took place.  Furthermore, Plaintiff

has another case pending the District of Maryland against the NSA and other private sector

defendants, in which Plaintiff alleges that Defendants conducted, inter alia, "illegal searches,

---

[6] Although Plaintiff's allegations appear implausible, Defendants are not addressing the merits or the feasibility of
the action sought by Plaintiff in the motion.  Defendants will address these claims as necessary pending the
resolution of this motion.

seizures, and thefts from Plaintiff's residence." Dula v. NSA, et al., 8:08-cv-00427-DKC (D. Md.).

### 3.    Transfer Would Serve the Public Interest.

The public interest also favors transfer. The relevant considerations include: the transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home. See Trout Unlimited v. United States Dep't of Agriculture, 944 F. Supp. 13, 16 (D.D.C. 1996) (citation omitted); Airport Working Group of Orange County, Inc., 226 F. Supp. 2d at 229. Since this action concerns federal law, the District of Maryland is as familiar with the applicable law as the District of Columbia. In addition, there is no evidence that the District of Maryland's docket is more congested than the District of Columbia's docket. See Exhibit 3.[7] Moreover, by granting the instant motion, the Court will promote judicial economy and consistency by permitting the District of Maryland to adjudicate these cases with identical plaintiffs, similar claims, and a defendant in common. All of these factors weigh in favor of transferring this case to the District of Maryland.

## II.    THE DEADLINE FOR DEFENDANTS' ANSWER SHOULD BE DEFERRED PENDING RESOLUTION OF THE TRANSFER MOTION.

Defendants also move, pursuant to Federal Rule of Civil Procedure 6(b)(1), that the deadline for submitting their answer or other response to Plaintiff's complaint be deferred pending resolution of this motion to transfer. Defendants' answer currently is due April 21, 2008. Defendants request that their answer be due no sooner than 15 days after the Court issues an order resolving the motion to transfer venue. If the Court grants Defendants' motion and transfers the case, the District of Maryland will determine when Defendants' answer and/or

---

[7] Exhibit 3: Federal Court Management Statistics 2007 – District Courts, *available at* http://www.uscourts.gov/cgi-bin/cmsd2007.pl (last visited Apr. 16, 2008).

response shall be due.  If the Court denies the motion, Defendants would submit their answer or other response within 15 days of the Court's order.

There is good cause to enlarge this deadline.  Defendants anticipate that they will file a dispositive motion pursuant to Federal Rule 12(b), in lieu of filing an answer.  However, the Court will have to resolve the instant motion to transfer before determining whether to reach the merits of that dispositive motion.  Further, if this case is transferred to the District of Maryland, the undersigned will not be counsel for Defendants, and the United States Attorney's Office for the District of Maryland will assume responsibility for the case.  The Assistant United States Attorney from that office will need time to become familiar with the case once the file is received.  Accordingly, deferring the deadline for Defendants' answer pending resolution of the motion to transfer would promote efficiency and conserve resources.

## CONCLUSION

For the foregoing reasons, this Court should GRANT Defendants' motion and transfer venue to the District of Maryland and GRANT Defendants' motion for an enlargement of time to file an answer or otherwise respond to Plaintiff's complaint.


Dated: April 18, 2008.                              Respectfully Submitted,




                                                     ___/s/_____
                                                     JEFFREY A. TAYLOR, D.C. BAR # 498610
                                                     United States Attorney



                                                     ___/s/_____
                                                     RUDOLPH CONTRERAS, D.C. BAR #434122
                                                     Assistant United States Attorney

_____/s/_____

BRANDON L. LOWY
Special Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530
(202) 307-0364

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
GARY DUEY DULA,                           )
                                          )
Plaintiff <u>pro se</u>,                  )
                                          )
v.                                        )        Civil Action No. 08-0196 (RBW)
                                          )
U.S. DEPARTMENT OF JUSTICE, <u>et al.</u>  )
                                          )
Defendants.                               )
_____)

## <u>ORDER</u>

Upon consideration of Defendants' Motion to Transfer Venue and for Enlargement of

Time to Respond to the Complaint, it is this _____ day of _____, 2008,

ORDERED that Defendants' Motion be, and hereby is, granted;

it is further ORDERED that:


____ this case be, and hereby is, TRANSFERRED to the District of Maryland;

____ Defendants' Answer or other response to the complaint shall be due on a date to be

set by the District of Maryland.


SO ORDERED.


_____
United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of April, 2008, I caused the foregoing Defendants'

Motion to Transfer Venue and for Enlargement of Time to Respond to the Complaint and Order

to be filed via the Court's Electronic Case Filing system, and served upon plaintiff, *pro se*, by

first-class mail, postage prepaid, addressed as follows:


GARY DUEY DULA, Plaintiff pro se
6207 Tecumseh Place
Berwyn Heights, MD 20740



_____/s/ _____
BRANDON L. LOWY

# >>Map and Directions



Map is not drawn to scale

**FROM BALTIMORE:**

Take MD 295 South (Balto/Wash Pkwy) OR I-95 South to Rt. 32 East/Ft Meade. Move to right lane and exit onto Canine Road immediately after 295 North. Turn left at the light onto Colony Seven Road. Follow past the aircraft and Shell station into Museum parking lot.

**FROM WASHINGTON:**

Take MD 295 North (Balto/Wash Pkwy) OR I-95 North to Rt. 32 East/Ft Meade. Exit onto Canine Road. Turn left at the light onto Colony Seven Road. Follow past the aircraft and Shell station into Museum parking lot.

**FROM COLUMBIA:**

Take Rt. 32 East. Move to right lane and exit onto Canine Road immediately after MD 295 North (Balto/Wash Pkwy). Turn left at the light onto Colony Seven Road. Follow past the aircraft and Shell station into Museum parking lot.

**FROM ANNAPOLIS:**

Take Rt. 32 West and bear right onto Canine Road. Turn left at the light onto Colony Seven Road. Follow past the aircraft and Shell station into Museum parking lot.

**LEAVING MUSEUM:**

Follow Colony Seven Road to light. Turn right onto Canine Road.

**To go north,** on Canine Road bear right onto entrance ramp for Rt. 32 West. Immediately exit onto MD 295 North (Balto/Wash Pkwy) or continue on Rt. 32 West to the I-95N exit.
**To go south,** on Canine Road bear right onto entrance ramp for Rt. 32 West. Take second exit onto MD 295 South (Balto/Wash Pkwy) or stay on 32 West to the I-95S exit.
**To go east,** on Canine Road bear left onto entrance ramp for 32 East. Follow bend around to merge onto 32 East.
**To go west,** on Canine Road bear right onto entrance ramp for Rt. 32 West.

Central Intelligence Agency
The Work of a Nation. The Center of Intelligence

Search     **>**

# FAQs

# FAQs

## We are often asked . . .

1. What does the Central Intelligence Agency (CIA) do?
2. Who works for the CIA?
3. How many people work for the CIA and what is its budget?
4. Does the CIA give public tours of its headquarters buildings?
5. Does the CIA release publications to the public?
6. Does the CIA spy on Americans? Does it keep a file on you?
7. Who decides when CIA should participate in covert actions, and why?
8. What is the CIA's role in combating international terrorism?
9. The CIA has been accused of conducting assassinations and engaging in drug trafficking. What are the facts?
10. Who oversees the CIA? Does it act on its own initiative?
11. Where is the CIA's headquarters? Is it in Langley or McLean, Virginia?
12. How do I cite a document on CIA's Web site as a source in my research paper/school report/term paper?
13. Who is a spy? Are there secret agents like James Bond with secret gadgets?
14. What if I want to eventually work for CIA?
15. Are there student internship programs or scholarships? Where can I find information about student programs?
16. Where do CIA officers work?
17. If I were to work for the CIA, what could I expect to do?

---

## 1. What does the Central Intelligence Agency (CIA) do?

The Central Intelligence Agency's primary mission is to collect, evaluate, and disseminate foreign intelligence to assist the president and senior US government policymakers in making decisions relating to the national security. The CIA does not make policy; it is an independent source of foreign intelligence information for those who do. The CIA may also engage in covert action at the president's direction in accordance with applicable law.

[Top of page]

## 2. Who works for the CIA?

The CIA carefully selects well-qualified people in nearly all fields of study. Scientists, engineers, economists, linguists, mathematicians, secretaries, accountants and computer specialists are but a few of the professionals continually in demand. Much of the Agency's work, like that done in academic institutions, requires research, careful evaluation, and writing of reports that end up on the desks of this nation's policymakers. Applicants are expected to have a college degree with a minimum GPA of 3.0 and must be willing to relocate to the Washington, D.C., area. Selection for Agency employment is highly competitive and employees must successfully complete a polygraph and medical examination and a background investigation before entering on duty. The Agency endorses equal employment opportunity for all employees. For further information, see the CIA Careers page.

[Top of page]

## 3. How many people work for the CIA and what is its budget?

Neither the number of employees nor the size of the Agency's budget can, at present, be publicly disclosed. A common misconception is that the Agency has an unlimited budget, which is far from true. While classified, the budget and size of the CIA are known in detail and scrutinized by the Office of Management and Budget and by the Senate Select Committee on Intelligence, the House Permanent Select Committee on Intelligence, and the Defense Subcommittees of the Appropriations Committees in both houses of Congress. The resources allocated to the CIA are subject to the same rigorous examination and approval process that applies to all other government organizations.

In 1997, the aggregate figure for all US government intelligence and intelligence-related activities—of which the CIA is but one part—was made public for the first time. The aggregate intelligence budget was $26.6 billion in fiscal year 1997 and $26.7 billion for fiscal year 1998. The intelligence budgets for all other years remain classified.

[Top of page]

## 4. Does the CIA give public tours of its headquarters buildings?

No. Logistical problems and security considerations prevent such tours. The CIA provides an extremely limited number of visits annually for approved academic and civic groups. A brief virtual tour is available on this Web site.

[Top of page]

## 5. Does the CIA release publications to the public?

Yes. The CIA releases millions of pages of documents each year. Much of this is

material of historical significance or personal interest that has been declassified under Executive Order 12958 (a presidential order outlining a uniform system for handling national security information) or the Freedom of Information Act and Privacy Act (statutes which give US citizens access to US government information or US government information about themselves, respectively). The Agency handles thousands of cases each year and maintains the CIA's FOIA Electronic Reading Room to release this information to the public and to provide guidance for requesting information. Some released information of significant public interest or historical value is also available at the National Archives and Records Administration. Specific copies of any previously declassified records are available directly from the CIA FOIA office.

The Agency frequently releases items of more general public interest on this Web site. The site includes general information about the CIA, unclassified current publications, speeches and congressional testimony, press releases and statements, careers information, and basic references, including the CIA World Factbook. Many documents, including the CIA World Factbook, reports on foreign economic or political matters, maps, and directories of foreign officials are also available in hard copy; these are listed in CIA Maps and Publications Released to the Public which is also posted available from the Office of Public Affairs. Publications on this list may be purchased from the Government Printing Office, the National Technical Information Service, and the Library of Congress.  Most CIA publications are classified, however, and are not publicly available.

For more information, contact the CIA Information and Privacy Coordinator at (703) 613-1287 or the Office of Public Affairs at (703) 482-0623.

[Top of page]

## 6. Does the CIA spy on Americans? Does it keep a file on you?

By law, the CIA is specifically prohibited from collecting foreign intelligence concerning the domestic activities of US citizens. Its mission is to collect information related to foreign intelligence and foreign counterintelligence. By direction of the president in Executive Order 12333 of 1981 and in accordance with procedures approved by the Attorney General, the CIA is restricted in the collection of intelligence information directed against US citizens. Collection is allowed only for an authorized intelligence purpose; for example, if there is a reason to believe that an individual is involved in espionage or international terrorist activities. The CIA's procedures require senior approval for any such collection that is allowed, and, depending on the collection technique employed, the sanction of the Director of National Intelligence and Attorney General may be required. These restrictions on the CIA have been in effect since the 1970s.

[Top of page]

## 7. Who decides when CIA should participate in covert actions, and why?

Only the president can direct the CIA to undertake a covert action. Such actions usually

are recommended by the National Security Council (NSC). Covert actions are considered when the NSC judges that US foreign policy objectives may not be fully realized by normal diplomatic means and when military action is deemed to be too extreme an option. Therefore, the Agency may be directed to conduct a special activity abroad in support of foreign policy where the role of the US government is neither apparent nor publicly acknowledged. Once tasked, the intelligence oversight committees of the Congress must be notified.

[Top of page]

## 8. What is the CIA's role in combating international terrorism?

The CIA supports the overall US government effort to combat international terrorism by collecting, analyzing, and disseminating intelligence on foreign terrorist groups and individuals. The CIA also works with friendly foreign governments and shares pertinent information with them.

[Top of page]

## 9. The CIA has been accused of conducting assassinations and engaging in drug trafficking.  What are the facts?

The CIA does neither.  Executive Order 12333 of 1981 explicitly prohibits the CIA from engaging, either directly or indirectly, in assassinations. Internal safeguards and the congressional oversight process assure compliance.

Regarding past allegations of CIA involvement in drug trafficking, the CIA Inspector General* found no evidence to substantiate the charges that the CIA or its employees conspired with or assisted Contra-related organizations or individuals in drug trafficking to raise funds for the Contras or for any other purpose. In fact, the CIA plays a crucial role in combating drug trafficking by providing intelligence information to the Drug Enforcement Administration, the Federal Bureau of Investigation, and the State Department.

> * See: Overview of Report of Investigation Concerning Allegations of Connections Between CIA and The Contras in Cocaine Trafficking to the United States

[Top of page]

## 10. Who oversees the CIA?  Does it act on its own initiative?

Both the Congress and the Executive Branch oversee the CIA's activities. In addition, the CIA is responsible to the American people through their elected representatives, and, like other government agencies, acts in accordance with US laws and executive

orders. In the Executive Branch, the National Security Council—including the President, the Vice President, the Secretary of State, and the Secretary of Defense—provides guidance and direction for national foreign intelligence and counterintelligence activities. In Congress, the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence, as well as other committees, closely monitor the Agency's reporting and programs. The CIA is not a policy-making organization; it advises the Director of National Intelligence on matters of foreign intelligence, and it conducts covert actions only at the direction of the President or Director of National Intelligence.

[Top of page]

### 11. Where is the Central Intelligence Agency's headquarters? Is it in Langley or McLean, Virginia?

Technically, you could say CIA headquarters is in both. "Langley" is the name of the McLean neighborhood in which the CIA resides.

The town of McLean was founded in 1910, but before then, the area where CIA Headquarters is located was known as Langley.

In 1719, Thomas Lee purchased a tract of land from the sixth Lord Fairfax (for whom Fairfax County, the county in which McLean is located, was named), and he named it "Langley" after his ancestral home in England. Though Lee never lived on the land, the Langley area soon became home to many European settlers. A few were wealthy people whom England had granted land, and they established large plantations in the area.

During the War of 1812, President James Madison and his wife Dolley fled the British siege of Washington to the safety of family and friends in Langley. Langley was a Union stronghold in Virginia, a southern state, during the Civil War and had two forts, Camp Griffin and Camp Pierpont, which housed soldiers who helped protect Washington.

With the building of the Great Falls & Old Dominion Railroad, 1903 was a defining year for Langley. John McLean, president of Washington Gas Light Company and, later, editor of the Washington Post, and Senator Stephen B. Elkins of West Virginia collaborated on construction of a railroad which would bring vacationing Washingtonians to nearby Great Falls and provide people who worked in Washington the choice of living outside of the city. In 1906, the railroad began operating, and the population of Langley and nearby Lewinsville quickly grew. In 1910, the post offices of these towns closed and, named for the man who helped the area grow, a new post office named "McLean" was opened. In 1959, the Federal government broke ground for the Central Intelligence Agency headquarters. Construction was completed in 1961, adding another chapter to McLean's long history.

Despite the name change in 1910, the name "Langley" still lingers to describe the McLean neighborhood where the CIA is located.

Source:
Ellis, Rafaela "A Community Called McLean"

[Top of page]

## 12. How do I cite a document on CIA's web site as a source in my research paper/school report/term paper?

There are many different styles for citing sources in a school paper. Various academic communities prefer one style to another, so consult with your instructor to find out which one is preferred.

One of the most popular styles is the following:

Central Intelligence Agency.
The World Factbook.
/library/publications/the-world-factbook
(date accessed)[1]

Heuer, Richards J. Jr.
1999
Psychology of Intelligence Analysis
/center-for-the-study-of-intelligence/csi-publications/books-and-monographs
/psychology-of-intelligence-analysis/
(date accessed)[1]

---

[1] Turabian, Kate L. A Manual for Writers of Term Papers, Theses, and Dissertations (Chicago Guides to Writing, Editing and Publishing). Chicago: University of Chicago Press, 1996.

[Top of page]

## 13. Who is a spy?  Are there secret agents like James Bond with secret gadgets?

A spy is someone who provides classified information about his country to another country. To clarify, CIA operations officers recruit foreign agents (you could also call them spies) who pass information to CIA. CIA operations officers do use some nifty "spy gadgets," and, while their jobs do occasionally present risks and challenges equal to the most exciting movies, for the most part, they are not nearly as glamorous or thrilling. Operations officers comprise only a small portion of the whole CIA workforce. Being an operations officer demands a forceful personality, keen intellectual ability, toughness of mind, and a high degree of personal integrity, courage, and love of country.

[Top of page]

### 14. What if I want to eventually work for CIA?

To qualify for a position with the Agency, you must be 18 years of age, a US citizen, and a high school graduate. Our personnel requirements change from month-to-month as positions are filled and others become available. A college degree, preferably an advanced degree, is a standard requirement for overseas officers, intelligence analysts, and other non-clerical positions. Knowledge of a foreign language is also helpful. Because the Agency's personnel needs span such a broad spectrum, we do not recommend any one academic track over another.

[Top of page]

### 15. Are there student internship programs or scholarships? Where can I find information about student programs?

The Agency has several student programs:

- The Undergraduate Scholar Program targets high school seniors who plan to major in the technical field. Students must have a minimum 3.0 high school GPA, 1000 SAT, or 21 ACT scores. Students receive tuition assistance and salary for the duration of their undergraduate course of study. Applicants must be US citizens and age 18 by 1 April of their senior year. Deadline is 1 November of students' senior year.
- In the Undergraduate Co-Op Program, college students receive paid training relating to their field of academic study. Students are expected to work three alternating semesters that include a summer. Students interested in the CIA Internship Program also receive paid training during at least two summers or a summer and semester.
- The Graduate Studies Program attracts students preparing to enter their first or second year of full-time graduate study. Graduate students work alongside experts in their field of study and usually work during the summer or on a semester basis. At least half choose CIA careers after graduation. Check out our website (www.cia.gov) for more information.

[Top of page]

### 16. Where do CIA officers work?

Most CIA officers live and work in the Washington, DC area. However, there are many opportunities to live and work overseas.

[Top of page]

### 17. If I were to work for the CIA, what could I expect to do?

There are many jobs that require a wide variety of specialties. Among them: operations officer working overseas recruiting foreign agents, intelligence analyst writing intelligence reports on Russian strategic nuclear forces or Middle Eastern terrorism, information officer looking for new technologies applicable to the CIA, or a security officer.

[Top of page]

* Adobe® Reader® is needed to view Adobe PDF files. If you don't already have Adobe Reader installed, you may download the current version at www.adobe.com (opens in a new window). [external link disclaimer]

- Privacy
- Copyright
- Site Policies
- USA.gov
- FOIA
- DNI.gov
- NoFEAR Act

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **DISTRICT OF COLUMBIA** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
| OVERALL CASELOAD STATISTICS | Filings* | | 2,870 | 2,947 | 3,383 | 3,121 | 3,461 | 3,382 | U.S. | Circuit |
| | Terminations | | 3,016 | 3,458 | 3,305 | 3,365 | 3,101 | 3,159 | | |
| | Pending | | 3,936 | 4,114 | 4,634 | 4,422 | 4,656 | 4,338 | | |
| | % Change in Total Filings | Over Last Year | | -2.6 | | | | | 57 | - |
| | | Over Earlier Years | | | -15.2 | -8.1 | -17.1 | -15.1 | 70 | - |
| | Number of Judgeships | | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months** | | 8.2 | .0 | .0 | .0 | 3.1 | 17.1 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 191 | 197 | 226 | 208 | 231 | 225 | 90 | - |
| | | Civil | 161 | 159 | 180 | 163 | 184 | 179 | 84 | - |
| | | Criminal Felony | 21 | 25 | 30 | 32 | 35 | 34 | 94 | - |
| | | Supervised Release Hearings** | 9 | 13 | 16 | 13 | 12 | 12 | 85 | - |
| | Pending Cases | | 262 | 274 | 309 | 295 | 310 | 289 | 79 | - |
| | Weighted Filings** | | 245 | 239 | 272 | 261 | 280 | 271 | 86 | - |
| | Terminations | | 201 | 231 | 220 | 224 | 207 | 211 | 91 | - |
| | Trials Completed | | 13 | 7 | 10 | 15 | 15 | 12 | 72 | - |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 15.3 | 14.4 | 12.9 | 12.8 | 10.2 | 9.6 | 91 | - |
| | | Civil** | 9.0 | 10.2 | 10.8 | 10.3 | 10.3 | 10.5 | 42 | - |
| | From Filing to Trial** (Civil Only) | | 44.0 | 37.0 | 35.0 | 27.4 | 25.0 | 29.0 | 79 | - |
| OTHER | Civil Cases Over 3 Years Old** | Number | 408 | 433 | 468 | 408 | 445 | 359 | | |
| | | Percentage | 14.8 | 15.1 | 14.1 | 12.8 | 12.7 | 11.1 | 88 | - |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.4 | 1.5 | 1.5 | 1.3 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 105.57 | 70.60 | 86.63 | 75.49 | 85.69 | 93.32 | | |
| | | Percent Not Selected or Challenged | 63.2 | 47.2 | 53.6 | 50.4 | 56.6 | 55.7 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2415 | 21 | 85 | 475 | 54 | 21 | 123 | 195 | 128 | 53 | 584 | 30 | 646 |
| Criminal* | 316 | 2 | 120 | 6 | 23 | 68 | 17 | 13 | 3 | 18 | 5 | 25 | 16 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

Case 1:08-cv-00196-RBW     Document 3-4     Filed 04/18/2008     Page 2 of 2

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **MARYLAND** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing |
| OVERALL CASELOAD STATISTICS | | Filings* | 4,292 | 4,035 | 4,395 | 4,753 | 4,572 | 5,244 | U.S. | Circuit |
| | | Terminations | 4,198 | 4,196 | 5,076 | 4,292 | 4,317 | 4,721 | | |
| | | Pending | 3,644 | 3,632 | 3,766 | 4,399 | 4,228 | 3,999 | | |
| | % Change in Total Filings | Over Last Year | | 6.4 | | | | | 16 | 3 |
| | | Over Earlier Years | | | -2.4 | -9.7 | -6.1 | -18.2 | 73 | 6 |
| Number of Judgeships | | | 10 | 10 | 10 | 10 | 10 | 10 | | |
| Vacant Judgeship Months** | | | .0 | .0 | .0 | 1.1 | 11.2 | 3.6 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 429 | 404 | 440 | 476 | 457 | 524 | 42 | 4 |
| | | Civil | 360 | 339 | 378 | 415 | 395 | 468 | 30 | 2 |
| | | Criminal Felony | 52 | 47 | 50 | 50 | 52 | 50 | 69 | 8 |
| | | Supervised Release Hearings** | 17 | 18 | 12 | 11 | 10 | 6 | 65 | 9 |
| | Pending Cases | | 364 | 363 | 377 | 440 | 423 | 400 | 49 | 3 |
| | Weighted Filings** | | 500 | 463 | 490 | 490 | 495 | 482 | 27 | 3 |
| | Terminations | | 420 | 420 | 508 | 429 | 432 | 472 | 50 | 5 |
| | Trials Completed | | 20 | 18 | 19 | 23 | 21 | 20 | 47 | 7 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 10.2 | 10.3 | 12.4 | 10.2 | 11.5 | 9.6 | 65 | 8 |
| | | Civil** | 6.3 | 7.4 | 8.9 | 7.1 | 7.5 | 8.9 | 8 | 2 |
| | From Filing to Trial** (Civil Only) | | 21.5 | 25.0 | 26.0 | 25.5 | 23.0 | 22.5 | 30 | 7 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 507 | 176 | 131 | 210 | 102 | 71 | | |
| | | Percentage | 17.3 | 6.0 | 4.2 | 5.6 | 3.1 | 2.3 | 89 | 9 |
| | Average Number of Felony Defendants Filed Per Case | | 1.6 | 1.5 | 1.5 | 1.6 | 1.5 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 52.17 | 57.10 | 54.94 | 52.14 | 55.07 | 48.17 | | |
| | | Percent Not Selected or Challenged | 30.2 | 35.9 | 33.7 | 31.1 | 38.7 | 35.5 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3601 | 227 | 86 | 868 | 127 | 66 | 235 | 441 | 431 | 98 | 491 | 2 | 529 |
| Criminal* | 518 | 2 | 147 | 41 | 116 | 82 | 34 | 30 | 4 | 18 | 8 | 6 | 30 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."